**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADUCAH**

| | | |
|---|---|---|
| DANIEL MCNALLY, individually and on behalf of all others similarly situated, | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Case No. 5:21-cv-0068 (TBR) |
| | ) | |
| THE KINGDOM TRUST COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Defendant Kingdom Trust's Motion to Dismiss, (Mot. to Dismiss), Dkt. 7. Plaintiff Daniel McNally has responded, (Resp.), Dkt. 30. Kingdom Trust has replied, (Reply), Dkt. 31. As such, briefing is complete and this motion is ripe for adjudication.

For the reasons that follow, Defendant Kingdom Trust's Mot. to Dismiss, Dkt. 7, is **GRANTED IN PART AND DENIED IN PART**.

**I.     FACTUAL BACKGROUND**

This case is a chapter in a long legal story. That story began in 2010 when William Jordan, a financial advisor living in California, started organizing investment funds ("WJA Funds"). *See* Compl. ¶¶ 2, 65–68. According to the Complaint, the WJA Funds consisted of sixteen private investment funds, including the PMB Fund, LLC, the Urban Produce Fund, LLC, and the Whirl Fund, LLC, just to name a few. *See id.* ¶ 59. The Complaint states that the WJA Funds were structured as "independent and separate entities" designed to pool investor money for investments in real estate, private equity, and other securities. *Id.* ¶¶ 2–3. Along with the WJA Funds, Jordan formed thirteen limited liability companies that were also used to raise

1

money from investors, such as William Jordan Investments and WJA Asset Management, LLC. *See id.* ¶ 52–56, 61.

Starting in 2011, Jordan began soliciting funding. *See id.* ¶¶ 3, 68, 73. As part of that process, Jordan told potential investors that the WJA funds were "independent and separate entities" and encouraged potential investors to purchase WJA Fund securities to capitalize on Jordan's investing expertise. *See id.* As the Complaint describes it, investors flocked to the WJA Funds. Over the next six years, the Complaint alleges that Jordan raised more than $71 million from investors through securities offerings organized by the WJA Funds. *See id.* ¶ 66. One of those investors, Daniel McNally, a resident of California, made several investments in the WJA Funds between 2015 and 2016. *See id.* ¶ 27. In total, McNally claims that he invested $450,000 in the WJA Funds. *See id.* The record indicates that McNally specifically invested in the PMB Fund, though it is possible that McNally also invested in other funds. *See id.*; *see also* Mot. to Dismiss at 2.

Then, in 2014, with the WJA Funds growing, Jordan contracted with Kingdom Trust, a public trust company. *See* Compl. ¶¶ 3, 30. Kingdom Trust served as the custodian for documents evidencing ownership of each individual WJA Fund and as the custodian for money associated with each individual WJA Fund. *See id.* Because of that, the Complaint describes Kingdom Trust as a "*de facto* bank" for the WJA Funds, *see id.* ¶ 3, though Kingdom Trust chooses instead to describe itself as a "non-depository" company, *see* Mot. to Dismiss at 1.

McNally alleges that Jordan used Kingdom Trust to help create the impression that the WJA Funds were safely in the custody of a third-party custodian. *See* Compl. ¶¶ 81–83. For example, Jordan allegedly wrote in an email that by opening the custodial accounts, the assets would no longer be under his direct control. *See id.* ¶ 85. This, Jordan wrote, made him

2

"happ[y]" because it "g[a]ve [him] a simple answer to the '[B]ernard [M]adoff' question[,]' which of course every client asks." *Id.* The Complaint further asserts that Jordan's claims about Kingdom Trust made sense to potential investors, because the investors were required to pay custodial fees to Kingdom Trust. *See id.* ¶ 84. And in the investors' minds, their fees were for Kingdom Trust to safeguard the investments. *See id.*

According to the Complaint, however, Jordan induced McNally and other investors to invest in the WJA Funds through material misrepresentations and omissions. *See id.* ¶¶ 77–91. Here, the Complaint states that Jordan prepared subscription agreements and operating agreements and distributed those documents to investors as part of his investment pitches. *See id.* ¶¶ 69, 77–80. Allegedly, those documents "grossly overstated the expertise of those involved in managing the investors' money," "disclosed only a fraction of the fees levied on investors," and "wholly mischaracterized the use of the investors' funds and how [Kingdom Trust] would maintain and supposedly safeguard the investors' funds." *Id.* ¶ 78. This mischaracterization, the Complaint asserts, was that the subscription agreements and operating agreements indicated investors' money would be deposited in a particular WJA Fund and kept separate and distinct from the other WJA Funds. *See id.* ¶ 79. However, the Complaint maintains that, in reality, investors' money was commingled, treated as one pool of money, misappropriated, and used for payments resembling a Ponzi scheme. *See id.* ¶ 80. The Complaint asserts that Jordan retained "personal[] control[]" over each WJA Fund, and in order to meet cash flow needs, Jordan would transfer money between the WJA Funds and other companies that he controlled. *See id.* ¶¶ 94–95. Put differently, when one WJA Fund was low on cash, Jordan would allegedly take new investor money from another WJA Fund and use that money to pay the existing investors. *See id.*

3

The Complaint further asserts that, for its part, Kingdom Trust knew about Jordan's alleged wrongdoings and actively participated in his scheme. *See id.* ¶¶ 116–24. To substantiate its claims about Kingdom Trust's role in Jordan's scheme, the Complaint describes Kingdom Trust and Jordan as having a "close and extensive relationship," where Kingdom Trust "held no less than 22 accounts for WJA Funds." *Id.* ¶ 120. And the Complaint asserts that as custodian for those accounts, Kingdom Trust prepared periodic reports and distributed those reports to WJA Fund investors. *See id.* ¶ 121. Allegedly, this process of preparing periodic reports required Kingdom Trust to review in detail the transactions for each of those accounts, which, McNally claims, means that Kingdom Trust must have learned about Jordan's conduct. *See id.* ¶ 152. The Complaint also alleges that Kingdom Trust executed and complied with Jordan's improper instructions to commingle, misdirect, misuse, and misappropriate investor money. *See id.* Despite obtaining knowledge of Jordan's wrongdoing, the Complaint states that Kingdom Trust still sent the periodic reports to the WJA Fund investors, even though those reports failed to disclose the commingling and misuse of investors' funds. *See id.* ¶ 154. Thus, the Complaint concludes, Kingdom Trust misrepresented the true value of the WJA Fund investments and received "substantial compensation" for "turn[ing] a blind eye." *See id.* ¶¶ 154, 194.

According to the Complaint, Kingdom Trust's conduct, which was a substantial departure from the typical activities of a custodian, violated its own contractual obligations and standard of conduct. *See id.* ¶ 118. Specifically, the Complaint cites Kingdom Trust's Custodial Services Agreement ("CSA") with each WJA Fund, which allegedly required Kingdom Trust to "[s]afe-keep the assets in the custodial/trust accounts," "[s]egregate such assets from those of any other WJA fund," "[m]onitor the transactions in the custodial/trust accounts it maintained for each WJA Fund," and "[p]repare and deliver to WJA Fund 'investors' . . . periodic, detailed

statements regarding their investments held . . . in the WJA Funds' accounts." *Id.* ¶ 142. Further reinforcing Kingdom Trust's responsibilities and obligations, the Complaint goes on to cite similar language from Kingdom Trust's website. *See id.* ¶ 148.

All of this alleged wrongdoing eventually came to light in what the Complaint refers to as the collapse of Jordan's scheme. *See id.* ¶ 97.

On August 16, 2017, Jordan was permanently barred from the securities and commodities industries by California regulators. *See id.* ¶ 46; *see also* Mot. to Dismiss at 7.

On May 15, 2018, the Securities and Exchange Commission filed a Complaint against Jordan alleging three counts of fraud. *See* Compl. ¶ 47; *see also SEC v. Jordan*, No: 8:18-cv-00852 (C.D. Cal. May 15, 2018). That same day, Jordan consented to an entry of Judgment, and on June 7, 2018, the court in that case entered judgment against him. *See* Compl. ¶ 47.

On April 29, 2020, McNally filed this Complaint on his behalf and on behalf of the other investors in the United States District Court for the Central District of California. *See* Ex. 1, Dkt. 21-1. The court there dismissed the case on the basis of a forum selection clause that required the lawsuit to be "instituted in the county courts of Calloway County, Kentucky." Ex. 5, Dkt. 21-5, at 6–7.

On April 13, 2021, McNally filed this lawsuit in Calloway County court, *see* Compl., and Kingdom Trust removed the case to the Western District of Kentucky, *see* Mot. to Remand, Dkt. 15. The Court previously concluded that removal was proper. *See* Mem. Op., Dkt. 27.

## II.    LEGAL STANDARD

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true."  *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)).  "But the district court need not accept a 'bare assertion of legal conclusions.' " *Tackett*, 561 F.3d at 488 (quoting *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)).

## III.   DISCUSSION

McNally brings seven counts against Kingdom Trust.  They are as follows: (1) violations of the Kentucky Securities Act, *see* Compl. ¶¶ 172–85; (2) aiding and abetting breach of fiduciary duty, *see id.* ¶¶ 196–209; (3) aiding and abetting fraud, *see id.* ¶¶ 186–95; (4) civil conspiracy, *see id.* ¶¶ 210–17; (5) breach of fiduciary duty, *see id.* ¶¶ 218–22; (6) fraud, *see id.* ¶¶ 223–29; and (7) negligent misrepresentations and omissions, *see id.* ¶¶ 230–41.

### A.  *Rule 19 Joinder*

Kingdom Trust argues that the Court must dismiss all of McNally's claims for failure to join Jordan; William Jordan Investments; WJA Asset Management, LLC; the PMB managed Fund, LLC; the other individual investment funds managed by Jordan; and Jordan's investment companies.  *See* Mot. to Dismiss at 17–19.

Rule 12(b)(7) of the Federal Rules of Civil Procedure provides for dismissal of a case where a plaintiff has failed to join a required party under Rule 19.  The Sixth Circuit uses a three-step analysis when determining whether Fed. R. Civ. P. 19 permits a case to proceed in the absence of a particular party.  *See Laethem Equip. Co. v. Deere & Co.*, 485 F. App'x 39, 43 (6th

6

Cir. 2012).  At the first step, courts "determine whether a person is necessary to the action and should be joined if possible."  *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1345 (6th Cir. 1993).  This is determined through Rule 19(a), which deems a party necessary if any one of the following three situations exist: (1) if "in the person's absence, the court cannot accord complete relief among existing parties," Fed. R. Civ. P. 19(a)(1)(A); (2) the absent person "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect that interest," Fed. R. Civ. P. 19(a)(1)(B)(i); or (3) the absent person "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest," Fed. R. Civ. P. 19(a)(1)(B)(ii).  The burden rests on the moving party to establish that a party is necessary under Rule 19(a).  *See, e.g.*, *Shepard & Assocs., Inc. v. Lokring Tech. LLC*, No. 1:20-CV-2488, 2021 WL 4340061, at *5 (N.D. Ohio Sept. 23, 2021).

Kingdom Trust first argues that Jordan and his investment companies and funds are necessary parties under Rule 19(a)(1)(A).  *See* Mot. to Dismiss at 17–18.  Here, Kingdom Trust claims that "[f]ailure to join these parties will inevitably result in the absence of complete relief . . . for the alleged wrongdoing of Jordan, the investment companies, and the individual WJA Funds."  *See id.* at 18.  Emphasizing that McNally's aiding and abetting claims require a finding that Jordan committed a tort, Kingdom Trust essentially argues that Fed. R. Civ. P. 19(a)(1)(A) is satisfied because McNally cannot recover for the harms caused by the absent parties.  *See id.*; *see also* Reply at 11.

But the problem for Kingdom Trust is that Rule 19(a)(1)(A) only looks to whether the Court can grant complete relief among "*existing parties*." (emphasis added). "As *Moore's Federal Practice* explains, [Rule 19(a)(1)(A)] 'requires joinder when nonjoinder precludes the court from effecting relief not in some overall sense, but between *extant parties*.' " *Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1182–83 (D.N.M. 2010) (quoting 4 *Moore's Federal Practice* § 19.03[2][b], at 19–39 to 19–41); *see also Dennis, et al. v. Good Deal Charlie, Inc., et al.*, No. 20-CV-295-JFH-FHM, 2021 WL 6048110, at *3 (N.D. Okla. Nov. 23, 2021) (same). The fact that McNally might have claims against the absent parties does not by itself make those parties necessary for complete relief. And here, the court can grant McNally all the relief that he is seeking against Kingdom Trust without adding the absent parties. *See Matlack Leasing, LLC v. Morison Cogen, LLP*, No. CIV.A. 09-1570, 2010 WL 114883, at *12 (E.D. Pa. Jan. 13, 2010) (permitting a plaintiff to proceed with an aiding and abetting claim without joining the principal party, because defendant's assertion that "any decision on plaintiffs' aiding and abetting claim requires a 'legally binding' decision on whether [the principal] breached his fiduciary duty . . . does not demonstrate necessity under Rule 19"); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, No. 19-CV-00226, 2020 WL 4194195, at *5 (E.D.N.Y. July 20, 2020), *aff'd*, 6 F.4th 308 (2d Cir. 2021) (concluding that even though defendants may be liable for aiding and abetting a breach of fiduciary duty in the instant litigation, and the principal party may not be liable in subsequent litigation, the principal party was not a necessary party under Rule 19(a)(1)); *Moshe v. TapIn2, Inc.*, No. 2:18-CV-09238-RGK-GJS, 2019 WL 3241189, at *3 (C.D. Cal. June 11, 2019) (finding that an absent party who "orchestrated the acts leading to this suit" was not a necessary party under Rule 19(a)(1)); *United States v. Payment Processing Ctr., LLC*, No. CIV.A.06-0725, 2006 WL 2990392, at *4 (E.D. Pa. Oct. 18, 2006) (stating that the

absent parties were not necessary under Rule 19(a)(1), because even though the absent parties

may have been "active participants" in defendants' alleged fraudulent conduct, the court could

accord complete relief among the existing parties).

In short, McNally seeks relief from Kingdom Trust. *See* Compl. McNally does not seek

relief from Jordan or his investment companies and funds. *See id.* Therefore, the Court can

accord complete relief among existing parties, which means that the absent parties are not

necessary under Fed. R. Civ. P. 19(a)(1)(A).

Kingdom Trust next argues that Jordan and his investment companies and funds are

necessary parties under Fed. R. Civ. P. 19(a)(1)(B).[1] Here, Kingdom Trust states that "Jordan

and his companies have a vested interest in the outcome of this litigation." Reply at 11. But

Kingdom Trust glosses over important language in Rule 19(a)(1)(B). Rule 19(a)(1)(B) requires

joinder where Jordan and his companies and funds "*claim*[] an interest relating to the subject of

the action." (emphasis added). And it is Kingdom Trust's burden to establish that Jordan and his

investment companies and funds "claim" such an interest. *See Shepard & Assocs., Inc.*, 2021

WL 4340061, at *5. Yet Kingdom Trust only argues that the absent parties "have" an interest in

this case; nowhere in its pleadings does Kingdom Trust assert that the absent parties have

"claimed" an interest in this case. *See* Mot. to Dismiss at 17–19; *see also* Reply at 10–11.

That's not enough for Kingdom Trust to satisfy its burden, because a party can "have" an interest

in a lawsuit and choose not to "claim" that interest. *See Laws v. Sony Music Ent., Inc.*, No. CV

03-2038 LGB (VBKx), 2003 WL 27375715, at *4 (C.D. Cal. May 2, 2003) ("[I]f [the absent

---

[1] It is unclear to the Court whether Kingdom Trust invokes Fed. R. Civ. P. 19(a)(1)(B)(i) or Fed. R. Civ. P. 19(a)(1)(B)(ii), or both. *See* Mot. to Dismiss at 17–19; *see also* Reply at 10–11. Regardless, both subparts (i) and (ii) are contingent upon the initial requirement that the absent party "claim[] an interest relating to the subject of the action." Fed. R. Civ. P. 19(a)(1)(B). Because Kingdom Trust has not satisfied its burden regarding this requirement, *see infra*, the Court does not discuss the remaining elements of Rule 19(a)(1)(B).

Case 5:21-cv-00068-TBR   Document 32   Filed 01/25/22   Page 10 of 33 PageID #: 543


party] is aware of the litigation and has chosen not to claim an interest, the Court may conclude that [the absent party] is not a necessary party."); *see also Harvill v. Harvill*, No. 3:12-CV-00807, 2013 WL 1245729, at *5 (M.D. Tenn. Mar. 27, 2013) (similar).  As such, the absent parties are not necessary under Fed. R. Civ. P. 19(a)(1)(B).

Because the absent parties are not necessary under Rule 19(a), the Court does not proceed to the second and third steps of the Rule 19 analysis.  *See Shepard & Assocs., Inc.*, 2021 WL 4340061, at *8.  McNally's failure to join Jordan, Jordan's companies, and Jordan's funds is not fatal to this litigation.  To the extent that Kingdom Trust argues otherwise, that part of its motion to dismiss is denied.

## B.  *The Kentucky Securities Act*

Like most states, Kentucky regulates securities sales and offers "through 'blue sky' laws, so named because they initially targeted swindlers so brazen and so shameless they would peddle shares of anything, including (allegedly) shares of the sky." *Bennett v. Durham*, 683 F.3d 734, 736 (6th Cir. 2012) (citing Jonathan R. Macey & Geoffrey P. Miller, *Origin of the Blue Sky Laws*, 70 TEX. L. REV. 347, 359–60 & n.59 (1991)).  McNally alleges that Kingdom Trust violated Kentucky's blue sky laws, specifically KRS §§ 292.320 and 292.480.  *See* Compl. ¶¶ 172–85.

KRS § 292.320 states that:

(1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

    (a)  To employ any device, scheme, or artifice to defraud;

    (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Similarly, KRS § 292.480 provides in relevant part:

(1) Any person, who offers or sells a security in violation of this chapter . . . or offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission[,] is liable to the person buying the security from him . . . .

(4) Every person who directly or indirectly controls a seller or purchaser liable under subsection (1) or (2) of this section, every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of a seller or purchaser who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist . . . .

Kingdom Trust offers three arguments as to why McNally's blue sky claims are not plausible on their face. First, Kingdom Trust argues that the blue sky laws do not apply in this case. Citing KRS § 292.313, which states that liability under §§ 292.320 and 292.480 is limited to "persons who sell or offer to sell when an offer to sell is made *in this state*, or an offer to buy is made and accepted *in this state*," (emphasis added), Kingdom Trust contends that McNally falls outside the category of persons protected by Kentucky's blue sky laws. *See* Mot. to Dismiss at 9–11; *see also* Reply at 8–10. That's because an "offer to sell or to buy" is "made in this state" when "the offer originates from this state or is directed by the offeror to this state and received at the place to which it is directed." KRS § 292.313(3). And Kingdom Trust claims that McNally "was offered to purchase and did in fact purchase securities *in the state of California*," Mot. to Dismiss at 10 (emphasis added), and "no allegation of any kind has been or

11

could be made that Kingdom [Trust] offered any direct advice to [McNally], or any investor, to

offer, sell or purchase any security *in Kentucky*," Reply at 9 (emphasis added).

According to the parties, the applicability of Kentucky's blue sky laws turns on *Dolomite*

*Energy, LLC v. Commonwealth of Kentucky Off. of Fin. Institutions*, 269 S.W.3d 883 (Ky. Ct.

App. 2008).  Kingdom Trust argues that *Dolomite Energy, LLC* construes Kentucky's blue sky

laws as applying only when the sale or purchase of securities comes from or substantially

includes the state of Kentucky.  *See* Reply at 9 (citing *Dolomite Energy, LLC*, 269 S.W.3d at

883).  By contrast, McNally claims that *Dolomite Energy, LLC* forbids Kentucky companies

from conducting any business practice which would operate as fraud or deceit upon any person.

*See* Resp. at 23 (citing *Dolomite Energy, LLC*, 269 S.W.3d at 885).  In reality, *Dolomite Energy,*

*LLC* does not reach as far as either party suggests.  That case simply held that Kentucky's blue

sky laws "are not limited to protection of Kentucky investors."  *Dolomite Energy, LLC*, 269

S.W.3d at 885.  So, *Dolomite Energy, LLC* does not definitively answer whether Kingdom

Trust's alleged conduct falls within the scope of Kentucky's blue sky laws.

However, because there is dearth of case law interpreting KRS § 292.313, the Court

looks to dicta in *Dolomite Energy, LLC*, which provides enough of a framework to guide today's

decision.  *Dolomite Energy, LLC* stated that Kentucky's blue sky laws serve, in part, "to preserve

the reputation of legitimate Kentucky companies and maintain national and international

confidence in the Kentucky market."  269 S.W.3d at 887; *see also id.* at 886 ("Kentucky's

commitment to protect the reputation of the Kentucky marketplace is evidenced by KRS

292.320.").  The court then indicated, as part of an excerpt from a Third Circuit opinion, that this

reputational interest exists "when [Kentucky] seeks to block the sales of securities that it believes

might be associated with dubious or manipulative sales practices," *id.* at 887 (quoting *A.S.*

*Goldmen & Co., Inc. v. New Jersey Bureau of Securities*, 163 F.3d 780, 788 (3rd Cir. 1999)), in order to "prevent [Kentucky] from being used as a base of operations for crooks marauding outside the state," *id.* (quoting *Stevens v. Wrigley Pharm. Co.*, 154 A. 403, 403 (N.J. Ch. 1931)). With that in mind, *Dolomite Energy, LLC* seems to contemplate a scenario where Kentucky's blue sky laws can be applied to a Kentucky company, even when purchasers and sellers of the securities reside outside of Kentucky.  *See id.*  Indeed, a Kentucky company could aid and abet out-of-state sales of securities and thereby tarnish Kentucky's reputation in the marketplace.  *See id.*; *accord In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 755 F. Supp. 2d 857, 875 (S.D. Ohio 2010) (explaining that Ohio's blue sky laws, which are similarly worded to Kentucky's, "reach[] a securities transaction between a non-Ohio seller and non-Ohio buyer, so long as the issuer is from Ohio and the seller has 'significant contacts' with the issuer"); *Cromeans v. Morgan Keegan & Co.*, 303 F.R.D. 543, 557 (W.D. Mo. 2014) (concluding that Missouri's blue sky laws, which are similarly worded to Kentucky's, apply to a defendant who is "alleged to have aided and abetted those out[-]of[-]state sales").  Moreover, such a reading of *Dolomite Energy, LLC* is consistent with the general view that blue sky laws should be broadly and liberally construed to give effect to their remedial purpose of preventing deception in the purchase of securities.  *See, e.g.*, *First State Bank of Pineville v. Wilson*, 55 S.W.2d 657, 658 (Ky. 1932) ("No trick, device, subterfuge or pretense shall be allowed to evade the operation or defeat the purpose of [Kentucky's blue sky laws], and [their] provisions shall be liberally construed in order that the purpose and intention of the act to protect the public from fraud, deceit, and imposition in the sale of the securities referred to in this act, may be carried out.")

Here, McNally alleges that Kingdom Trust, which is headquartered in Kentucky, "knowingly and materially aided in the acts or transactions constituting violations of"

Kentucky's blue sky laws.  Compl. ¶ 184; *see also id.* ¶ 29.  Specifically, McNally claims that

Kingdom Trust: (1) "opened trust/custodial accounts for the WJA Funds," *id.* ¶ 138; (2) was

"mandated" "to safeguard the respective WJA Fund investors' money, safe-keep it in separate

accounts and not commingle it with any other Funds' money, and send those investors, on a

regular basis, certain information about the respective WJA Fund," *id.* ¶ 141; (3) "gained actual

knowledge that Jordan was improperly commingling, mis-directing, misappropriating, and

misusing in Ponzi scheme fashion investor fiduciary money deposited in each respective WJA

Fund," *id.* ¶ 151; (4) "committed its own fraud when it created and sent statements to the WJA

Fund investors regarding the Funds' assets and funds in each account and the transactions in said

accounts, but failed to disclose the commingling, misuse, and misappropriation," *id.* ¶ 154; (5)

"improperly and atypically commingled . . . fiduciary money in a single pool in violation of its

and Jordan's fiduciary duties to the investors and the WJA Funds," *id.* ¶ 157; (6) "agreed to give

Jordan unfettered access to the pooled assets and funds, allowing him to improperly shift money

at his discretion," *id.* ¶ 158; and (7) "knowing[ly] assist[ed]" Jordan in "making a series of

unauthorized interfund transactions, withdrawing large sums for himself and his colleagues at

will, and making Ponzi payments to shift new investor funds to meet cash flow demands for

failing funds," *id.* ¶ 161.

     The bottom line is that McNally alleges that Jordan "attempted to create the impression

that having third party custodians . . . would enhance investors' safety," yet Kingdom Trust

"assisted Jordan in accomplishing the opposite and assisted in his fraudulent activity."  *Id.* ¶ 110.

These allegations, if true, would make Kentucky "a base of operations for crooks marauding

outside the state," thereby undermining confidence in Kentucky's marketplace, the very interest

that Kentucky's blue state laws are meant to protect.  *Dolomite Energy, LLC*, 269 S.W.3d at 887

(quoting *Stevens*, 154 A. at 403). Therefore, the Court finds that, at this stage of the litigation, where a plaintiff's allegations must be taken as true, and reasonable inferences drawn therefrom, McNally makes a plausible claim that under KRS § 292.313 Kentucky's blue sky laws apply to this dispute.

Kingdom Trust's second argument for dismissal of the blue sky claims is that McNally "does not allege that Kingdom [Trust] independently offered to sell securities to Plaintiff, nor does Plaintiff allege that he bought securities from Kingdom [Trust]." Mot. to Dismiss at 10. According to Kingdom Trust, that means that McNally is relying upon an aiding and abetting theory of liability. *See id.* And this, Kingdom Trust asserts, is fatal to the blue sky claims because an aiding and abetting theory of liability only works when the company accused of aiding and abetting materially assisted an individual in violating Kentucky's securities laws. *See* Reply at 9 (citing *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 897 (W.D. Ky. 2010)). Yet Kingdom Trust maintains that the principal parties, Jordan and his companies and funds, each a resident of California, did not violate Kentucky's securities laws by transacting with McNally, a California resident. *See id.* McNally seems to admit that Kingdom Trust did not participate in the sale of the securities at issue, arguing instead that the complaint need only plead facts sufficient to show that Kingdom Trust aided and abetted the fraudulent scheme. *See* Resp. at 23 (citing *Clayton*, 754 F. Supp. 2d at 897). Although McNally alleges in the Complaint that Jordan violated Kentucky's blue sky laws, *see* Compl. ¶ 181, McNally does not discuss the extent to which it matters that the principal party might not have violated Kentucky law, *see* Resp.

Both parties rely on *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884 (W.D. Ky. 2010) in their dispute about whether McNally's allegations of aiding and abetting liability are

enough to satisfy the requirements of Kentucky's blue sky laws. *See* Resp. at 23; *see also* Reply at 9. However, *Clayton* did not determine whether § 292.480(4) imposes aiding and abetting liability on a party who materially assists a person in violating another state's security laws. *See* 754 F. Supp. 2d at 897. Rather, *Clayton* merely found that an individual was not subject to liability under § 292.480(4) "because he did not meet the definition of an 'agent' under Kentucky securities law." *Clayton v. Heartland Res., Inc.*, No. 1:08CV-00094-JHM, 2011 WL 2534088, at *2 (W.D. Ky. June 27, 2011); *see also Clayton*, 754 F. Supp. 2d at 897.

However, there is very little case law that has addressed this issue at all. So again, the Court turns to dicta. The court in *Clayton* wrote that KRS § 292.480(4) "has been interpreted in other jurisdictions as imposing aiding and abetting liability on those who materially assist others in violating *the state'*s securities laws." 754 F. Supp. 2d at 897 (emphasis added) (citing *Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1325 (8th Cir. 1991)). *Clayton* therefore seemed to endorse Kingdom Trust's position: for aiding and abetting liability to attach in this instance, the principal party must have violated "the state's securities laws," *i.e.*, "Kentucky's securities laws." *See id.* A subsequent opinion by this Court agreed with this language. Quoting *Clayton*, *Bennett v. Durham* explained that § 292.480(4) " 'impos[es] aiding and abetting liability on those who materially assist others in violating the state's securities laws' *in other jurisdictions*." No. 1:10-CV-147, 2011 WL 1225671, at *5 (W.D. Ky. Mar. 30, 2011), *aff'd*, 683 F.3d 734 (6th Cir. 2012) (emphasis added) (quoting *Clayton*, 754 F. Supp. 2d at 897). Not only did Bennett approve of *Clayton's* language, but it also took the extra step of specifying that the principal party must have violated the state's securities laws "in other jurisdictions," providing greater evidence that aiding and abetting liability in this instance only attaches when the principal party operating outside of Kentucky is alleged to have violated *this state's* laws. *See Bennett*, 2011

16

WL 1225671, at *5.  Even though the quoted language in *Clayton* and *Bennett* was not part of either holding, it provides enough evidence for the Court to determine that Kingdom Trust is correct.  The Court concludes that § 292.480(4) imposes aiding and abetting liability on those who materially assist others in violating Kentucky's securities laws.[2]

Therefore, the question then becomes whether McNally has alleged sufficient information to plausibly suggest that Jordan and his companies and funds violated Kentucky's blue sky laws.  The Court believes that McNally has done so.  In Count I of the Complaint, McNally alleges that Jordan "offered and sold" securities" to "Plaintiff and the members of the Class, through numerous and untrue statements of material facts as well as omissions of material facts in the offering documents regarding the use of investment proceeds, transaction history, and financial condition of the WJA Funds."  Compl. ¶ 177.  The Complaint goes on to state that as part of that scheme, Jordan "violated the provisions of the Securities Act of Kentucky" because Kingdom Trust, a company headquartered in Kentucky, "kept the Ponzi scheme running" by "accept[ing] and process[ing] WJA Funds investors' deposits."  *Id.* ¶¶ 181–182.  These allegations satisfy McNally's burden, especially when Kingdom Trust does not explicitly rebut the allegations that Jordan did in fact violate Kentucky's blue sky laws.  *See* Mot. to Dismiss; *see also* Reply.

Kingdom Trust's third and final argument for dismissal of the blue sky claims is that McNally does not allege that Kingdom Trust "actively assisted in offering securities for sale, solicited offers to buy, or actually performed the sale."  Mot. for Dismiss at 10 (citing *Sierra*

---

[2] The Court notes that this conclusion does not conflict with its interpretation of KRS § 292.313.  Indeed, an out-of-state person could use Kentucky as "a base of operations for crooks marauding outside the state," which would undermine confidence in Kentucky's marketplace and satisfy the requirements of § 292.313.  *Dolomite Energy, LLC*, 269 S.W.3d at 887 (quoting *Stevens*, 154 A. at 403).  In that scenario, if the out-of-state person violated Kentucky's securities laws, then § 292.480(4) could impose aiding and abetting liability on the Kentucky company involved in the scheme.

*Enterprises Inc. v. SWO & ISM, LLC*, 264 F. Supp. 3d 826, 842–43 (W.D. Ky. 2017)).  Here, Kingdom Trust relies on *Sierra Enterprises Inc.*, but that reliance is misplaced.  In *Sierra Enterprises Inc.*, the alleged aider and abettor had not even been formed before the sale of the subject securities was completed.  *See* 264 F. Supp. 3d at 843.  By contrast, McNally alleges that Kingdom Trust was an already organized Kentucky company that materially assisted Jordan with the offer and sale of the fraudulent securities.  *See* Compl. ¶¶ 171–85.  The Court is therefore not persuaded by Kingdom Trust's argument here.

Accordingly, the Court finds that McNally's allegations under the Kentucky Securities Act survive Kingdom Trust's motion to dismiss.

### C. *Aiding and Abetting Breach of Fiduciary Duty*

McNally next alleges that Jordan and other wrongdoers owed fiduciary duties to McNally and other investors, and that Kingdom Trust aided and abetted Jordan and those wrongdoers in breaching their fiduciary duty to investors.  *See* Compl. ¶¶ 196–209.

Kentucky law "recognizes a claim for aiding and abetting tortious conduct, which covers fiduciary-breach claims."  *Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (citing *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991)).  To prevail on this claim, a plaintiff must show: (1) "the existence and breach of a fiduciary duty;" (2) "the defendant gave the breaching party 'substantial assistance or encouragement' in effectuating the breach;" and (3) "the defendant knew that the party's conduct breached that fiduciary duty."  *Sierra Enterprises Inc.*, 264 F. Supp. 3d at 843 (quoting *Miles Farm Supply, LLC*, 595 F.3d at 666).

Kingdom Trust disputes each element of this claim, asserting that McNally does not allege existence and breach of a fiduciary duty, substantial assistance, or actual knowledge on its

part.  *See* Mot. to Dismiss at 11–14; *see also* Reply at 6.  The Court addresses each of those arguments below.

> i.        *Existence and Breach of Fiduciary Duty*

Kingdom Trust argues that McNally has "not proven that a fiduciary duty between himself and Jordan existed."  Reply at 6.  The Court rejects this argument.  McNally alleges that "Jordan owed fiduciary duties to Plaintiff and the other investors because the investors placed their trust and confidence in Jordan, their advisor, and the Jordan Scheme to manage the WJA Funds to invest their money appropriately."  Compl. ¶ 197.  McNally further alleges that he "relied on . . . Jordan and the Jordan Scheme perpetrators . . . representations" of "their superior knowledge, diligence, and expertise."  *Id.* ¶ 198.  These allegations regarding a financial advisor investing McNally's money are sufficient to indicate that a fiduciary relationship existed between McNally and Jordan.  *See RQSI Glob. Asset Allocation Master Fund, Ltd v. Aperçu Int'l PR LLC*, 683 F. App'x 497, 502 (6th Cir. 2017) ("[W]hether an investment advisor has a fiduciary duty depends on the nature of the customer's account and the amount of control exercised by the advisor.  Here, a fiduciary relationship was created when Aperçu assumed discretionary control over investing and RQSI approval was no longer required for Aperçu to trade.").

> ii.       *Substantial Assistance*

"Substantial assistance" occurs when a defendant's conduct was a "substantial factor" in causing the tort.  *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) (citing Restatement (Second) of Torts § 876).  Courts in the Sixth Circuit must consider five factors when determining whether substantial assistance has been provided: (1) "the nature of the act encouraged;" (2) "the amount of assistance given by the defendant;" (3) "[the defendant's]

19

presence or absence at the time of the tort;" (4) "[the defendant's] relation to the other;" and (5) "[the defendant's] state of mind." *See Aetna Cas. & Sur. Co.*, 219 F.3d at 537 (quoting *Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co.*, 113 F.3d 1484, 1495 (8th Cir. 1997)); *see also Sierra Enterprises Inc.*, 264 F. Supp. 3d at 843.  Also relevant to this analysis is "the duration of the assistance provided." *See Aetna Cas. & Sur. Co.*, 219 F.3d at 537 (quoting *TMJ Implant Recipients*, 113 F.3d 1495).

Essentially invoking all of the above factors, Kingdom Trust argues that it could not have substantially assisted Jordan in conducting a fraudulent scheme because "the funds [were] not controlled by Kingdom [Trust]."  Motion to Dismiss at 14.  Here, Kingdom Trust asserts that it had a contractual obligation with Jordan to disperse and transfer the funds as Jordan directed, and to do otherwise would have breached Kingdom Trust's fiduciary duties to each WJA Fund.  *See id.*  According to Kingdom, "Jordan and/or Mickey Payne [the PMB Fund's representative] and/or any designated signee to the various WJA Funds maintained complete and unilateral control over the custodial sub-accounts."  *Id.* at 12; *see also id.* at 3.  Kingdom Trust adds that it had no affirmative duty to investigate what seemed like legitimate transactions made by the PMB Fund.  *See id.*  McNally calls Kingdom Trust's argument here "inaccurate."  Resp. at 20.  To the contrary, McNally maintains that Kingdom Trust "retained the right to refuse to comply with any request with respect to the money in the Funds' accounts, if it believed that such request could render it liable."  *Id.* (citing CSA, Ex. 2, Dkt. 1-5, § 10).

This is a factual dispute about the extent of Kingdom Trust's discretion and control over the WJA Funds.  Resolving this factual dispute on a motion to dismiss would be inappropriate.  *See Handmaker v. CertusBank, N.A.*, No. 3:15-CV-129-TBR, 2015 WL 13636654, at *3 (W.D. Ky. Nov. 5, 2015).  Rather, at this stage of the proceedings the Court must construe the

20

allegations in McNally Complaint as true.  *See id.*  Therefore, Kingdom Trust's argument that it had no control or discretion over the WJA Funds does not merit dismissal of McNally's aiding and abetting breach of fiduciary duty claim.[3]

Turning to McNally's claims, the Complaint alleges that Kingdom Trust substantially departed from its typical activities as custodian and violated its own contractual obligations under the CSA with each of the WJA Funds, which enabled Jordan to obtain money from his victims and improperly commingle that money in a single pool and misuse it for Ponzi-like payments.  *See* Compl. ¶¶ 116–24; *see also* Resp. at 17.  Based on these allegations, each of the relevant factors suggest that McNally has set out a facially plausible claim that substantial assistance did in fact occur.  First, the allegations involve "defrauding [investors] and breaching . . . fiduciary duties to them by misusing and misappropriating the money."  *Id.* ¶ 117.  Second, the Complaint asserts that Kingdom Trust "offered Jordan the essential infrastructure through which he was able to perpetrate his fraud."  *Id.* ¶ 116.  Third, Kingdom Trust "reviewed and had to review in detail the transactions in each of the custodial/trust accounts" and "the assets of money it maintained in each of the [] accounts."  *Id.* ¶¶ 122–23.  Fourth, McNally describes Kingdom Trust as having "a close and extensive relationship with Jordan and his funds."  *Id.* ¶ 120.  Fifth, according to McNally, Kingdom Trust played a "knowing" role in assisting in Jordan's scheme.  *Id.* ¶ 116.  And underpinning all of that is the fact that Kingdom Trust's alleged wrongful activity occurred continuously over a multi-year time period.  *See id.*

_____

[3] McNally also seems to argue that Kingdom Trust could still be liable even if it did not have any discretion or control over the WJA Funds.  *See* Resp. at 16.  Citing *Bariteau v. PNC Fin. Servs. Grp., Inc.*, No. 3:06CV-132-S, 2006 WL 8451094, at *3 (W.D. Ky. Oct. 31, 2006) and *Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 425 (W.D.N.Y. 2017), McNally suggests that Kingdom Trust's failure to act is enough for the Court to find that substantial assistance exists in this case.  *See id.*  However, because the Court concludes that there is a factual dispute about Kingdom Trust's affirmative conduct, the issue of whether Kingdom Trust's alleged inaction constitutes substantial assistance need not be addressed today.

21

All of this indicates that McNally has set out a plausible claim that Kingdom Trust's actions were a substantial factor in Jordan and the other wrongdoers breaching their fiduciary duties to investors.

### iii.   *Actual Knowledge*

"[A]ctual knowledge" is required for the purposes of establishing aiding and abetting liability, however "the requisite intent and knowledge may be shown by circumstantial evidence." *Sierra Enterprises Inc.*, 264 F. Supp. 3d at 840 (quoting *Aetna Cas. & Sur. Co.*, 219 F.3d at 535–36).

Kingdom Trust contends that McNally "has not proven that Kingdom [Trust] had actual knowledge that Jordan's conduct breached any fiduciary duty to [McNally]." Reply at 6. To support its position, Kingdom Trust emphasizes the fact that it had "no direct one-on-one contact" with McNally, apart from providing quarterly accounting statements. *Id.* McNally disagrees, stating that he has alleged sufficient facts to support an inference that Kingdom Trust had actual knowledge of Jordan's breach of fiduciary duty. *See* Resp. at 13.

The Court finds that the Complaint adequately pleads that Kingdom Trust had actual knowledge. McNally alleges that Kingdom Trust knew Jordan was breaching his fiduciary duties to McNally and other investors. *See* Compl. ¶ 151. The Complaint also alleges that Kingdom Trust participated in Jordan's scheme by comingling assets into a single pool, which helped Jordan use investor money for Ponzi-like payments. *See id.* ¶¶ 156–63. McNally supports these claims of knowledge with more detailed factual allegations. For example, McNally alleges that Kingdom Trust gained knowledge through "[i]ts multi-year long, close relationship . . . with Jordan, . . . which included opening and servicing at least 22 WJA Fund trust/custodial accounts and preparing a vast number of periodic reports," "[i]ts monitoring of the

22

WJA Fund trust/custodial accounts pursuant to its duties," and "[i]ts executing, and complying with, Jordan's improper instructions to commingle, mis-direct, misuse and misappropriate investor money." *Id.* ¶ 152.  In addition to detailing the source of Kingdom Trust's knowledge, the Complaint also alleges that Kingdom Trust "substantially depart[ed]" from the typical procedures of a trustee or custodian.  *Id.* ¶ 118.  This further supports the general allegations of knowledge.  *See Aetna Casualty & Surety Co.*, 219 F.3d at 536 ("[A]lthough short-term lending may be 'commonplace,' the details of this particular loan (e.g., its four-day duration straddling the July 1996 month end) were highly unusual.").

The Court cannot predict whether a jury will find that Kingdom Trust substantially assisted in or had actual knowledge of the alleged tort, but the record gives McNally's claims facial plausibility.  Accordingly, the Court concludes that McNally's allegations of aiding and abetting breach of fiduciary duty, and the reasonable inferences therefrom, are sufficient to survive Kingdom Trust's motion to dismiss.

## D. *Aiding and Abetting Fraud*

The Complaint seeks damages against Kingdom Trust for aiding and abetting fraudulent conduct.  *See* Compl. ¶¶ 186–95.

"Aiding and abetting tortious conduct, including fraud, is a recognized claim in Kentucky."  *Great Am. Ins. Co. v. Poynter*, No. 110-CV-00161-JHM, 2013 WL 1181445, at *4 (W.D. Ky. Mar. 20, 2013) (citing *Lappas v. Barker*, 375 S.W.2d 248, 252 (Ky. 1963)).  As with a claim for aiding and abetting a breach of fiduciary duty, "[t]o prove that a party aided and abetted fraud, a plaintiff must show that the defendant gave 'substantial assistance or encouragement' to the person who committed fraud and that the defendant knew of the wrongful conduct."  *Id.* (citing *Miles Farm Supply*, 595 F.3d at 666); *see also Sierra Enterprises Inc.*, 264

F. Supp. 3d at 840.  And because McNally's aiding and abetting breach of fiduciary duty claim is based upon the alleged fraud perpetrated by Jordan, the analysis here is "much the same" as above.  *Sierra Enterprises Inc.*, 264 F. Supp. 3d at 841.  As discussed *supra* Part III.C.ii–iii, it is plausible to conclude that Kingdom Trust substantially assisted Jordan in perpetrating the fraud and that Kingdom Trust knew of the wrongful conduct.  Indeed, McNally alleges that Kingdom Trust "knowingly": "receiv[ed] money from investors," "improperly facilitate[ed] the commingling of the WJA Fund investors' funds," "transferr[ed] Ponzi scheme payments amongst the WJA Funds' accounts investments," and "improperly transferr[ed] investor money to Jordan."  Compl. ¶ 192.

Therefore, the Court finds that McNally's aiding and abetting fraud claim survives Kingdom Trust's motion to dismiss.

### E. *Civil Conspiracy*

McNally next sets out a civil conspiracy claim.  *See* Compl. ¶¶ 210–17.  In order to prevail on a claim of civil conspiracy, "the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act."  *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek and Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (citing *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995)); *see also Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 422–23 (6th Cir. 2013).

Kingdom Trust argues that the statute of limitations has expired on McNally's civil conspiracy claim.  *See* Mot. to Dismiss at 7–8.  McNally does not respond to this argument.  *See* Resp.

Civil conspiracy claims have a one-year statute of limitations.  *See* KRS 413.140(1)(c); *see also Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995); *Muncy v. InterCloud Sys.*, Inc.,

92 F. Supp. 3d 621, 643 (E.D. Ky. 2015). "The statute of limitations for a civil conspiracy claim 'generally begins to run at the time of the last overt act in furtherance of the conspiracy.' " *Anderson v. Knox Cty.*, No. CV 6:17-133-KKC, 2018 WL 7500205, at \*9 (E.D. Ky. Oct. 3, 2018) (citing *Branham v. Micro Comput. Analysts, Inc.*, 2008 WL 1868016, at \*2 (E.D. Ky. Apr. 24, 2008)). Although it is not clear to the Court exactly when the last overt act in furtherance of Jordan's scheme occurred, it is clear that McNally's civil conspiracy claim is untimely under Kentucky's one-year statute of limitations. Kingdom Trust states that on August 16, 2017, the Department of Business Oversight of California issued a consent order barring Jordan form any position of employment, management, or control of any investment adviser, broker-dealer, or commodity adviser. *See* Compl. ¶ 46; *see also* Mot. to Dismiss at 7. And approximately one year later, on May 15, 2018, the SEC filed its Complaint against Jordan alleging three counts of fraud. *See* Compl. ¶¶ 47, 98; *see also* Mot. to Dismiss at 8; *SEC v. Jordan*, No: 8:18-cv-00852 (C.D. Cal. May 15, 2018). McNally does not allege that the conspiracy continued after those dates. *See* Compl. So at the latest, the statute of limitations ran out one year after the SEC filed its Complaint against Jordan, on May 15, 2019. However, McNally filed suit against Kingdom Trust in the Central District of California on April 29, 2020 (almost a year after the statute of limitations had expired) and in Calloway County court on April 13, 2021 (almost two years after the statute of limitations had expired). *See SEC v. Jordan*, No: 8:18-cv-00852 (C.D. Cal. May 15, 2018); *see also* Compl.

Thus, the Court finds that McNally's claim of civil conspiracy against Kingdom Trust is barred by the statute of limitations set forth in KRS § 413.140(1)(c). Kingdom Trust's motion to dismiss is granted as it pertains to this claim.

F. ***Breach of Fiduciary Duty***

Count V of the Complaint sets out a claim for breach of fiduciary duty.  *See* Compl. ¶¶ 218–22.  Here, the Complaint asserts that Kingdom Trust owed to McNally and other investors a fiduciary duty with respect to their money deposited in trust/custodial accounts.  *See id.* ¶ 219.

"As a general rule, banks do not owe a fiduciary duty to their customers."  *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 4 (Ky. Ct. App. 2012) (citing *de Jong v. Leitchfield Deposit Bank*, 254 S.W.3d 817, 822 (Ky. App. 2007)).  Kentucky courts only impose a fiduciary duty on a bank in where the bank possesses confidential information about its customer that it uses for its own gain.  *See id.*  Although McNally alleges that Kingdom Trust profited from its role in Jordan's scheme, *see* Compl. ¶ 194, the record does not indicate that Kingdom Trust used any of the investors' confidential information as part of this scheme, *see id.* Perhaps sensing this vulnerability, McNally instead argues that the fiduciary duty still applies because Kingdom Trust was aware that it was holding investor money for the benefit of investors, which "bound [Kingdom Trust] to act [with] the highest good faith toward the beneficiaries of the trust accounts."  Resp. at 22.  However, "[a] fiduciary duty requires more than the generalized obligation of good faith and fair dealing."  *In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002); *see also Childress v. Bank of Am.*, N.A., No. CV 18-154-DLB-CJS, 2019 WL 3767464, at *12 (E.D. Ky. Aug. 9, 2019) (same).

Therefore, McNally's allegations of breach of fiduciary duty, which in reality are no more than allegations of breach of the generalized obligation of good faith and fair dealing, do not survive Kingdom Trust's motion to dismiss.

26

G. *Fraud*

McNally alleges that Kingdom Trust committed its own fraud when it created and sent statements to investors regarding the WJA Funds' assets and transactions.  *See* Compl. ¶ 224; *see also id.* ¶¶ 223–29.

In a Kentucky action for fraud, the party claiming harm must establish six elements of fraud by clear and convincing evidence: (1) a "material representation" (2) "which is false" (3) "known to be false or made recklessly" (4) "made with inducement to be acted upon" (5) "acted in reliance thereon" and (6) "causing injury."  *Anderson v. Wade*, 33 F. App'x 750, 756 (6th Cir. 2002) (quoting *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)).

Kingdom Trust makes four arguments as to why it believes that McNally fails to plead any facts upon which a claim for fraud can be established.  First, Kingdom Trust contends that it did not make a "material representation."  *See* Mot. to Dismiss at 15; *see also* Reply at 6–7. Here, Kingdom Trust claims that the allegedly false statements "came from Jordan, his investment companies[,] and/or the WJA Fund into which the investor invested money."  Mot. to Dismiss at 15.  Characterizing itself merely as a "delivery service," Kingdom Trust maintains that it made no representation.  *Id.*  McNally disputes this, saying that Kingdom Trust was "far more than a 'delivery service.' "  Resp. at 21.  According to McNally, Kingdom Trust was required "to keep timely and accurate records of the Custodial Assets and report all transactions in the WJA Funds to the Fund investors," which means that it "knew the representations"—that it "prepare[d]"—"made in those statements about account value were false."  *Id.*

Essentially, the parties here dispute the role that Kingdom Trust played in preparing the periodic reports.  Such an argument is better reserved for a motion for summary judgment or

trial, after discovery illuminates the details of Kingdom Trust's precise role in disseminating information to investors.  *See Handmaker*, 2015 WL 13636654, at *3.

Second, Kingdom Trust argues that even if it did make material representations, the representations were not made with inducement to be acted upon.  *See* Reply at 6–7.  That's because McNally had already invested in Jordan's scheme.  *See id.* at 7.  For his part, McNally claims that he "justifiably relied on [Kingdom Trust's] statements and conduct in keeping his money invested under [Kingdom Trust's] custody," and therefore the statements were made with inducement to be acted upon because McNally and other investors continued to pay Kingdom Trust.[4]  Compl. ¶ 234.

Though this is a close call, the Court concludes for the purposes of ruling on the motion to dismiss that McNally has alleged sufficient facts to suggest that Kingdom Trust made its statements to induce the investors to act.  True, McNally does not allege that Kingdom Trust's statements were made prior to his decision to invest in the PMB Fund; nor does McNally allege that Kingdom Trust reached out to investors about entering into any a future agreement; nor does McNally allege that Kingdom Trust's representations were made as part of any sort of negotiations.  *See* Compl.  These facts cut against McNally.  *See Morris v. Tyson Chicken, Inc.*, No. 4:15-CV-00077-JHM, 2015 WL 7188479, at *7 (W.D. Ky. Nov. 13, 2015); *see also Arapahoe Res., LLC v. Pro. Land Res.*, LLC, No. CIV. 15-10-ART, 2015 WL 4887321, at *11 (E.D. Ky. Aug. 17, 2015).  Importantly, however, McNally alleges that Kingdom Trust

---

[4] McNally does not seem to argue that he made investments in the WJA Funds after receiving the periodic statements from Kingdom Trust.  *See* Resp. at 20 (directing the Court to ¶ 228 of the Complaint, which states that McNally "justifiably relied on [Kingdom Trust's] fraudulent statements and conduct in keeping his money invested and under [Kingdom Trust's] company").  However, the Complaint elsewhere states that McNally "made several investments in the WJA Funds . . . between 2015 and 2016." Compl. ¶ 27.  If McNally invested in the WJA Fund after receiving a periodic report from Kingdom Trust, that would make it even more likely that the representations were made with inducement to be acted upon.  However, because McNally does not make such an argument, the Court only notes that this one-off allegation could possibly provide further support for McNally's claim.

"purposefully hid . . . information regarding the commingling of funds because it knew that if it disclosed this information to the investors, they would have taken steps to terminate their relationship with [Kingdom Trust] and the WJA Funds."  Compl. ¶ 225.  According to the Complaint, then, Kingdom Trust misrepresented the true value of the investments so that the investors would act in a certain way, *i.e.*, keeping their money invested in the WJA Funds.  *See id.*  Hence, the Complaint sets out a plausible prima facie case that Kingdom Trust's alleged statements induced McNally's investments in Jordan's scheme.  *See In re P & J Res., Inc.*, 475 B.R. 838, 861 (Bankr. E.D. Ky. 2012).

Third, Kingdom Trust maintains that it "had no part in, and could not have known of, any potential illegal or wrongful actions conducted by Jordan prior to Jordan submitting the state of a sub-account to Kingdom."  Reply at 7.  Here, Kingdom Trust claims that McNally misunderstands where investors' money was kept, resulting in "unequivocally false" allegations. *Id.*  However, McNally sticks by his understanding of the investment accounts and reiterates that that Kingdom Trust knew the representations it made in those statements were false.  *See* Resp. This is a factual dispute about how the accounts for each WJA investment fund were treated, and as such, it is inappropriate to resolve this matter at the dismissal stage.  *See Handmaker*, 2015 WL 13636654, at *3.

Fourth, Kingdom Trust argues that McNally "fails to include in his Complaint" certain facts that add "context" to this claim.  *See* Mot. to Dismiss at 15–16.  Specifically, Kingdom Trust asks the Court to consider a disclaimer on its website, an online application form, and information on its Frequently Asked Questions page.  *See id.*  However, evidence outside of the complaint is not proper in the context of a motion to dismiss, which looks to the complaint to determine whether a plaintiff has stated facts that, if true, give plaintiff a claim for relief.  *See*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  As such, Kingdom Trust's attempt to introduce new facts does not require dismissal of McNally's fraud claim.

Therefore, McNally's allegations of fraud survive Kingdom Trust's motion to dismiss.

### H.  *Negligent Misrepresentations and Omissions*

In Count VII of the Complaint, McNally alleges that Kingdom Trust negligently omitted material information and made misrepresentations concerning the misuse, commingling, and misappropriation of the funds in each of the Jordan accounts.  *See* Compl. ¶ 231; *see also id.* ¶¶ 230–41.

Kentucky courts have adopted the standard for negligent misrepresentation set forth in the Restatement (Second) of Torts § 522.  *See Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580 (Ky. 2004).  A negligent misrepresentation claim is therefore defined as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justified reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* (quoting Restatement (Second) of Torts § 552 (1977).  Negligent misrepresentation requires "an affirmative false statement," "mere omissions will not do."  *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 260 (6th Cir. 2012) (quoting *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 (Ky. 2011)).

McNally asserts that the Complaint alleges an affirmative false statement because it "clearly identif[ies] the 'vast number of periodic reports for each of the 22 or more WJA Funds Defendant prepared and distributed to investors."  Resp. at 12.  And according to McNally, "the statements made in those reports were false or misleading."  *Id.*  Kingdom Trust offers three reasons as to why it believes that McNally does not allege an affirmative false statement.  First,

30

Kingdom Trust claims that its reports were "truthful representations of the state and status of the specific sub-account a particular investor had invested in."  Reply at 2.  With one party claiming the reports were "truthful," and the other party describing the reports as "false or misleading," this appears to be a factual dispute that it is inappropriate for a motion to dismiss.  *See Handmaker*, 2015 WL 13636654, at *3.  Courts are generally confined to considering a plaintiff's complaint in ruling on a 12(b)(6) motion to dismiss, and where, as here, the plaintiff and defendant disagree as to whether specific information is true, the Court will not resolve that factual issue at the dismissal stage.

Second, Kingdom Trust argues that it had "no independent ability to alter the state of a particular sub-account, let alone the documentation it was provided by the sub-account's holder (Jordan)."  Reply at 2.  Whether or not that is true is a factual question better left for a future date.  *See supra* Part III.C.ii; *see also Handmaker*, 2015 WL 13636654, at *3.  Additionally, "statements about the 'quality' and 'reliability' " of Jordan's investment funds "may be actionable, if [Kingdom Trust] failed to exercise reasonable care in making the statements and [McNally] justifiably relied on them to [his] detriment."  *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 730 F. Supp. 2d 683, 697 (W.D. Ky. 2010).  And here, McNally alleges that although Kingdom Trust had "knowledge" that "Jordan was raising money from investors and was defrauding them and breaching his own fiduciary duties to them by misusing and misappropriating that money," Kingdom Trust still sent McNally "reports mak[ing] it appear that the funds were working as originally advertised."  Compl. ¶¶ 117, 232.  McNally further alleges that he relied upon those reports in keeping his money invested and under Kingdom Trust's custody.  *See id.* ¶ 234.  Therefore, the Court is satisfied that McNally has presented sufficient

31

allegations of Defendants' affirmative representations via its periodic reports to establish a prima facie case for negligent misrepresentation.

Third, Kingdom Trust Maintains that McNally's allegations have not been pled with "particularity;" that is, McNally "has not alleged . . . that there was any business transaction entered into specifically between [the parties] and/or that Kingdom [Trust] provided any advice, at any time, to the Plaintiff regarding any business transaction." Reply at 3. According to Kingdom Trust, this is fatal to McNally's negligent misrepresentation claim because § 552(1) applies to "false information [supplied] for the guidance of others *in their business transactions*." (emphasis added); *see also* Reply at 3. Kingdom Trust's argument misses the mark here. The allegations against Kingdom Trust occurred as part of a business or commercial setting, which strongly suggests that a business transaction occurred. *See Carr v. Lake Cumberland Reg'l Hosp., LLC*, No. CV 15-138-DLB-HAI, 2017 WL 1078636, at *3 (E.D. Ky. Mar. 21, 2017). And according to the Complaint, McNally's investment strategy was based upon the information in the periodic reports. *See* Compl. ¶ 234; *see also Barton Brands, Ltd. v. O'Brien & Gere, Inc. of N. Am.*, No. CIV.A. 3:07-CV-78-H, 2009 WL 1037556, at *4 (W.D. Ky. Apr. 17, 2009). What's more, the alleged harm here was pecuniary, suggesting that the alleged false information was in fact part of a business transaction. *See Carr*, 2017 WL 1078636, at *3. Taken together, these allegations support the conclusion that McNally has pled enough particularity for the negligent misrepresentation claims to survive a motion to dismiss.

Accordingly, the Court will not dismiss McNally's negligent misrepresentation claim at this stage.

## IV.      CONCLUSION

For the above stated reasons, **IT IS HEREBY ORDERED** that Defendant Kingdom Trust's Mot. to Dismiss, Dkt. 7, is **GRANTED IN PART AND DENIED IN PART**.

Federal Rule of Civil Procedure 23(c)(1)(A) directs the Court to determine "[a]t an early practicable time" whether to certify an action as a class action.  Therefore, in order to advance this matter, the parties shall submit a proposed scheduling order on or before **February 7, 2022**. A telephonic conference is set for **February 14, 2022**, at **12:00 p.m. CST**.  Counsel and parties must call **1-877-848-7030** then give the Ac**cess Code 2523122 and #, then when prompted press # again** to join the call.

**IT IS SO ORDERED**

**Thomas B. Russell, Senior Judge**
**United States District Court**

January 25, 2022

33